Kent ALEXANDER, Plaintiff–Appellee,

v.

William PERRILL and Luis Rivera, Defendants–Appellants.

No. 88–15842.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1989.

Decided Oct. 10, 1990.

Steven McNamee, U.S. Atty., Eugene Bracamonte, Asst. U.S. Atty., Tucson, Ariz., for defendants-appellants.

A. Bates Butler, III, Butler & Stein, P.C., Tucson, Ariz., for plaintiff-appellee.

Before REINHARDT, BEEZER and KOZINSKI, Circuit Judges.

REINHARDT, Circuit Judge:

William Perrill and Luis Rivera, defendants in this *Bivens* action[1], appeal the denial by the district court of their motion for summary judgment on their defense of qualified immunity. Perrill and Rivera are federal prison officials. They contend that the district court erroneously decided that their failure to consider Alexander's valid claim that he was being incarcerated for a longer period than permitted by law amounted to deliberate indifference to a violation of his clearly established constitutional or statutory rights. We affirm the denial of their summary judgment motion.

## FACTS

On November 4, 1983, Alexander was arrested in the Republic of Germany on local charges. He was due to be released from a German jail on a bail bond on January 5, 1984, but wasn't, because a detainer was issued by the United States on January 3, 1984. Subsequently, he was convicted of the German charges and in August of 1984 began serving a fifteen month prison term.

On October 11, 1984, German authorities notified the United States that Alexander was not required to complete the remainder of his German sentence. The German authorities further indicated that he had been detained for extradition since October 9, 1984, and that the forty-day period for presentation of documents for extradition had begun to run.[2] The United States Embas-

---

1. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court decided that citizens may sustain an action for money damages against federal officers for violation of constitutional rights.

2. Article 16, Section 4 of the Extradition Treaty between the United States and the Republic of Germany provides:

    (4) Provisional arrest shall be terminated if within a period of forty days after the apprehension of the person sought the requested

sy formally requested his extradition on October 23, 1984.

On February 5, 1985, Alexander was delivered to American authorities. He was subsequently tried and convicted of fraud and income tax charges. At his sentencing hearing, the district court received evidence that his German conviction had been vacated pursuant to German law. The district court therefore ordered that his presentence investigation report reflect that he had been in the custody of the United States for twenty-one months as of October 21, 1985. The court thus adopted Alexander's position that United States custody had commenced on January 21, 1984. He was then sentenced to a 3½ year prison term.

On June 20, 1986, Alexander was transferred to the Federal Correctional Institution, Tucson (FCI–Tucson). At that time, William Perrill was the Warden and Luis Rivera was the Administrative Systems Manager of the institution. Rivera was under Perrill's supervision and was responsible for computation of jail sentences and any applicable jail time credit for inmates at FCI–Tucson.

The Bureau of Prisons' policy requires that jail credit from a foreign jail be verified and monitored by the Central Office, Bureau of Prisons in Washington, D.C. (Central Office). Bureau of Prisons Program Statement 5880.24. On July 1, 1986, the Department of International Affairs (DIA) contacted the Central Office and argued that, according to German authorities, Alexander was not in custody solely for extradition purposes until October 9, 1984. The DIA requested that Alexander's jail and presentence credits be adjusted to reflect that fact. On July 2, the Central Office sent a memorandum to Rivera advising him that he was authorized to correct the jail time so that Alexander would receive credit only for the period from October 9, 1984.

Alexander was shown the Central Office memorandum on July 9, 1986. He objected to Rivera and Perrill, orally and in writing, regarding the decision to recalculate his sentence and to the summary manner in which it was reached. He requested the prison officials to conduct an investigation. On several instances, Alexander met with Rivera and presented him with certified court documents which Alexander claimed entitled him to the jail and presentence credits. Rivera made no inquiries, conducted no investigation, did not forward the documents to the Central Office, and made no effort to determine whether the Central Office was aware of all of the facts submitted to him by Alexander. Instead, he continued to rely exclusively on the Central Office memorandum and rejected Alexander's claim.

In response to Alexander's requests for an investigation into the Central Office's computation of the jail credits, Perrill checked with Rivera about the calculation of the sentence. Rivera informed Perrill that the calculation was based on the memorandum received by the Central Office. Perrill was satisfied with that response and took no further action; in fact, neither of the two officials made any further inquiry regarding Alexander's claims.

Alexander's first petition for writ of habeas corpus was dismissed on the ground that he had failed to exhaust his administrative remedies. He then resumed his efforts to persuade Perrill to act by filing a formal complaint demanding reinstatement of his credits and an investigation into their withdrawal. Perrill and Rivera, again relying exclusively on the Central Office memorandum, denied Alexander's request. Alexander then appealed the decision to the Regional and Central Office of the Bureau of Prisons as provided for by prison regulations.[3] The appeals were unsuccessful.

After exhausting his administrative remedies, Alexander filed a second petition for writ of habeas corpus in district court. Al-

state has not received the request for extradition and the documents mentioned in Article 14. This period may be extended upon the requesting state's application for up to an ad-

ditional twenty days after the apprehension of the person sought.

3. The Bureau of Prisons Administrative Remedy Procedure is set forth in 28 C.F.R. § 542.10–16.

exander alleged in the petition that the withdrawal of the foreign jail and presentence credits was improper and that he was entitled to immediate release. The district court agreed and ordered the Bureau of Prisons to recompute Alexander's sentence so as to give him credit for the period between January 13, 1984 and October 9, 1984. The court further ordered his release from prison. No appeal from the district court's orders was taken.

Alexander then filed this action seeking declaratory relief and money damages. In his complaint, he alleged that the prison officials' failure to afford him the presentence and jail credits and their failure to investigate his claims that his sentence was incorrectly calculated constituted deliberate indifference to his constitutional and statutory rights. The prison officials moved for summary judgment arguing that they were entitled to qualified immunity because Alexander's rights were not "clearly established" and that, in any event, they acted reasonably in response to his requests to have his credits recomputed.

The district court rejected the prison officials' arguments on the narrow ground that the failure to accede to Alexander's requests for an investigation constituted deliberate indifference to a clearly established right. Accordingly, the Court found that the prison officials were not entitled to qualified immunity and denied their motion for summary judgment.[4] Defendants appeal.[5] We affirm.

## ANALYSIS

### I

Alexander contends that the prison officials were deliberately indifferent to his constitutional and statutory rights when they refused to investigate the claim that his credits had been improperly computed.[6] The prison officials disagree; they also argue that the qualified immunity defense is applicable in any event because Alexander's rights were not "clearly established" when he demanded an investigation. It is only the latter question that we need consider on this appeal.[7] We review de novo a district court's denial of summary judgment based upon a qualified immunity defense. *White by White v. Pierce County*, 797 F.2d 812, 814 (9th Cir.1986).

Taking the undisputed facts as the district court characterized them, the defendants did nothing to inquire into or investigate Alexander's complaints.[8] Judge Bilby made an observation that would strike a responsive chord in the hearts of most citizens, "You see, that's one of the things about bureaucrats that bothers me. You just can't sit on your duff and not do anything." He then announced that "[i]f you just sit around and don't do anything, you do run a chance of being responsible." We agree, wholeheartedly.

---

4. In its memorandum, the district court stated in part:

   "[T]he undisputed facts indicate that defendants were informed on numerous occasions of plaintiff's contention that his sentence had been miscalculated. These assertions by the plaintiff were supported by documentary evidence. Defendants present no evidence that they investigated plaintiff's claims in any manner. This failure to investigate constituted deliberate indifference."

   It appears that the district court did not explicitly foreclose the possibility of reconsidering the deliberate indifference issue at trial, nor in fact the qualified immunity issue. However, the question of the precise effect of the district court's ruling is not now before us, only the appeal from the failure to grant defendants qualified immunity by way of summary judgment.

5. We have jurisdiction over this interlocutory appeal pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (a district court's order denying summary judgment based on qualified immunity defense is appealable, notwithstanding interlocutory nature of the order).

6. Alexander also contends that the refusal of the prison officials to afford him credit for his presentence and jail time constituted deliberate indifference. Because we find that the prison officials are not entitled to immunity for refusing to investigate his claim, we need not reach the broader issue.

7. See n. 5 supra.

8. On appeal, the government does not argue that this factual characterization is clearly erroneous.

■ As a general rule, an official is entitled to qualified immunity from damages if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We must identify the applicable law and determine whether that law was "clearly established" at the time the defendants acted. *Todd v. United States,* 849 F.2d 365, 368 (9th Cir.1988). We have recently explained the rationale behind this analysis:

"If the controlling law is not clearly established, a reasonable person would not be expected to know how to structure his conduct in order to avoid liability. In such a case the defendant will be immune from suit. On the other hand, if a defendant has violated clearly established law, he will generally be liable."

*Id.* at 368–69 (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984)).

The allegations in Alexander's complaint give rise to a somewhat different qualified immunity question than we usually are faced with in *Bivens* cases. Typically, we are required to determine whether the official should have known that his *affirmative conduct* violated someone's rights. Here, however, Alexander urges that the defendants are not entitled to qualified immunity because they had a duty to *protect* his rights and the official's failure to act was inconsistent with that duty.

■ We have previously held that under § 1983 the qualified immunity defense is inapplicable whenever an official "does an affirmative act, participates in another's affirmative acts, or *omits to perform an act which he is legally required to do* that causes the deprivation [of an individual's rights]." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) (emphasis added). Under § 1983 when an official fails to take an action that he has a clearly established duty to take and that failure is a foreseeable contributing factor to the violation of a plaintiff's constitutional rights, the defense

is similarly unavailable. *Id.* We see no reason that same rule should not apply in *Bivens* cases. *See Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978) (for purposes of immunity analysis no distinction should be drawn between suits brought against state officials under § 1983 and suits brought under the Constitution against federal officials); *Lonneker Farms, Inc. v. Klobucher,* 804 F.2d 1096, 1097 (9th Cir.1986) (same). On this appeal, the question is whether the prison officials failed to perform a clearly established duty that they were required to perform in order to protect the Constitutional rights of the plaintiff and others like him. To answer this question, we must decide whether it was clearly established that the particular conduct of the officials was, in fact, violative of the duty.

This formulation of our inquiry effectuates the purpose of the rule set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court was careful to explain that the qualified immunity defense is not intended to provide a license to engage in lawless conduct. Similarly, that defense does not constitute a license to refrain from carrying out one's lawful duties. Rather, it is intended to allow a public official to act with "independence and without fear of consequences" when his actions are not clearly contrary to the law. *Harlow* 457 U.S. at 819, 102 S.Ct. at 2738. *Harlow* tells us that where an official can be expected to know that certain conduct would violate statutory or constitutional rights, "he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.*

The inquiry we have described is fully consistent with the Supreme Court's ruling in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), which requires us to look to the defendant's conduct in a particularized sense. We must find that the contours of the duty were sufficiently clear that a reasonable official would understand that what he was doing violated that duty. *Id.* at 640, 107 S.Ct. at

3039. Thus, we consider whether it was clearly established that Perrill and Rivera had a duty to investigate Alexander's claim that he was being incarcerated for a longer period than permitted by law.[9]

## II

■ Perrill and Rivera do not contend that they have absolutely no duty to investigate a prisoner's claim that his sentence has been miscalculated. Such a contention would clearly be meritless in light of the evidence in the record.[10] Instead, they urge that because the Central Office had issued a memorandum declining to grant Alexander the credits, and because the merits of Alexander's claim were complex, the duty to investigate his complaint was no longer clearly established. In effect, the prison officials' contention relates only to the level of specificity aspect of our inquiry, i.e. whether in light of the Central Office's prior contrary ruling, their conduct violated a clearly established duty to investigate Alexander's claim. Defendants appear to advance the theory that they cannot be held accountable for their inaction because there are no cases establishing the duty of prison officials to investigate claims under the precise circumstances present here.

Initially, we must disagree with the defendants' characterization of the law that applies to cases of the type before us. Under the defendants' theory, an official would be immune from damages even if a reasonable person would have known that his conduct violated an individual's rights, merely because the plaintiff's injury did not occur after the precise facts had already been litigated in a prior case. In essence, defendants would have the courts litigate each of the duties for which a government official will be held accountable once before any official can ever be held liable for a breach—and then only if the breach occurred after the courts had finally resolved the initial case. The defendants would also permit us to impose liability only if the prior litigation involved precisely the same factual circumstances that are present in the case before us. The defendants' arguments fail for two reasons.

■ First, the law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty. *See Anderson* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. In fact, we need only look to decisional law when an official can argue that the newly emerging status of an individual's right made it less than clear for a reasonable official to know how to proceed. *See Bergquist v. County of Cochise*, 806 F.2d 1364, 1368 (9th Cir.1986). We

9. The prison officials have suggested that Alexander cannot prevail on his failure to investigate claim unless he can show that it was clearly established that he was entitled to the presentence and jail credits. Alexander's right to an investigation is, of course, wholly independent of his right to be released from prison. Cf. *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773 (9th Cir.1982). While the question whether an investigation would have resulted in Alexander's release may be relevant to other issues, at a later stage of this litigation, it has no relevance to this appeal. Here, we are not concerned with whether the plaintiffs can ultimately establish liability, only with whether the defendants' conduct is protected by the doctrine of qualified immunity.

10. Mandatory and specific language in the Code of Federal Regulations' Administrative Remedy Procedures requires Perrill, as Warden of the federal institution, to investigate inmate complaints of this nature. According to the Admin-

istrative Remedy Procedures, Perrill was responsible for (1) the operation of the Administration Remedy Procedure at the institution; (2) establishing procedures for receiving, reviewing, investigating and responding to complaints or appeals by an inmate; and (3) *conducting investigations into each complaint. See* 28 C.F.R. § 542.11(a). (emphasis added)

Similarly, it can be inferred from the evidence in the record that Rivera's duties as Administrative Systems Manager of the institution included the responsibility to assure that Alexander's sentence was computed correctly. The district court has not yet permitted discovery which would allow Alexander to prove the extent of Rivera's job responsibilities; however, Rivera has admitted that he was responsible for computing the sentences of all the inmates at the prison. For purposes of summary judgment, we must infer that this responsibility includes the obligation to take reasonable and necessary steps to ensure that the computation is performed accurately.

recently disposed of a similar argument summarily in *Wood v. Ostrander*, 879 F.2d 583, 592 (9th Cir.1989). There, we said

> "Ostrander seemingly suggests that this case can be disposed of if it does not bear a strict factual similarity to previous cases finding liability. However, this crabbed view of the good faith immunity principle cannot withstand analysis."

Here, the prison officials' obligation to investigate Alexander's claim need not be set out in decisional law. Their duties are clearly established by virtue of the Bureau of Prisons regulations and policies which they were legally obligated to perform.

Second, even if we accepted the defendants' theory as to the need for a prior case establishing the duty at issue, Alexander would still prevail because he is fortunate enough to have had a similar issue previously litigated and decided in his favor—a case which inexplicably both parties failed to cite in their briefs. In *Haygood v. Younger*, 769 F.2d 1350 (9th Cir.1985) (en banc), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986) this court, sitting en banc, considered a case under § 1983 in which prison officials failed to investigate a claim that a prisoner's sentence had been miscalculated. *Id.* at 1355. As a result the prisoner was incarcerated beyond his lawful term. In *Haygood*, we held that a judgment against prison officials was proper because "after being put on notice, [the prison officials] simply refused to investigate a computational error." *Id.* We found that the failure to investigate was in itself sufficient evidence to support a finding of liability.

It is worth noting that in Haygood's case, as here, the plaintiff's argument that he was entitled to be released from prison was not clearly meritorious from the face of the objections he lodged with the prison officials. After the California prison officials decided which of Haygood's four separate sentences should run consecutive or concurrent to each of the others, Haygood objected to the determination. The prison officials spoke with each other and responded to Haygood's objections in writing. They attached an opinion from the state attorney general that they believed to be supportive of their letter. *Haygood*, 769 F.2d at 1353. Nonetheless, we concluded that the prison officials were deliberately indifferent to Haygood's constitutional rights because they failed to address his credible evidence that he was entitled to release. *Id.* at 1355.[11]

■ Here, as in *Haygood*, the defendants' responsibilities included ensuring the proper calculation of prison sentences. Nevertheless, when faced with the possibility that a mistake was made, they did nothing to attempt to determine whether Alexander's claim was meritorious. We simply will not, as the defendants urge, embrace a rule which would allow prison officials to stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim. Thus, we reaffirm our decision in *Haygood* that prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so when a reasonable request is made.

The cases which postdate *Haygood* do not suggest any reason to modify our conclusion. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and its progeny require us to find that the contours of defendants' duties were sufficiently clear that a reasonable prison official would have understood that a failure to act under the circumstances would be wrongful. *See id.* at 640, 107 S.Ct. at 3039. Here, there is no question that defendants had a duty to investigate Alexander's complaint when he presented his evidence to them. A reasonable prison official would have known that he was under a duty to

---

**11.** For purposes of this appeal, it is unimportant that the *Haygood* court found the prison officials ultimately violated the plaintiff's right to be free from cruel and unusual punishment, rather than the right to due process and to be free from double jeopardy as alleged in this case. The issue before us only involves the question whether a qualified immunity defense bars the claim. The issue, thus, as we have said earlier, is only whether there was a clearly established duty to investigate. *Haygood* answers that question in the affirmative.

act. By bringing the evidence to the defendants' attention, Alexander sought to have an erroneous determination by the Central Office reexamined. In the Central Office memorandum, the Chief of Administrative Systems for the Bureau of Prisons had stated that, according to information he had received from the DIA, Alexander was not entitled to the credits. Alexander, however, offered verified court documents and other proof to rebut the DIA's information. There can be no doubt that Alexander's material at a minimum raised a substantial question regarding the correctness of the Central Office's conclusion.

█ Finally, defendants appear to suggest that they had *no duty to investigate* claims regarding foreign jail credits. There is no basis in the record for any such suggestion. Bureau of Prisons Program Statement 5880.24 provides only that information concerning foreign jail time be sent to the Central Office for verification and monitoring purposes. It does not relieve prison officials of their duty to investigate complaints by prisoners under 28 C.F.R. § 542.11(a) or vest exclusive jurisdiction over the investigation of claims for foreign jail credits in the Central Office. Moreover, the government points to no evidence in the record that the Central Office was aware of the new information Alexander submitted. Nor is there anything in the record to suggest that the defendants had reason to believe that the Central Office had seen any of Alexander's material before coming to its conclusion. Under these circumstances, at the very least it was incumbent upon the prison officials to inquire as to whether the Central Office was aware of Alexander's evidence at the time it reached its decision. The failure to make any such inquiry and the continued reliance on the Central Office's memorandum without further investigation constituted a clear breach of a well-established duty.[12]

█ We have no cause to determine whether the officials engaged in further or additional breaches or whether we could conclude that a breach occurred had the circumstances been different. In conclusion, however, we reiterate our view that "strict factual similarity" is not required in order to find that a right or a duty is clearly established. All that is necessary is that a reasonable person would have known that the right or duty exists.

For the above reasons, we hold that the district court properly refused to grant Perrill's and Rivera's motions for summary judgment on their defense of qualified immunity.[13]

The judgment of the district court is AFFIRMED.

KOZINSKI, Circuit Judge, dissenting:

Plaintiff has been the victim of the kind of nightmare those of us involved in administering our penal system take great pains to avoid—undeserved punishment because of a bureaucratic blunder. Justice would no doubt be served by compensating him for the time he has been wrongly imprisoned. But whatever claims he may have do not run against the defendants. *They* did not make the error in calculating his foreign jail credits; *they* were not the ones

---

**12.** Even if Program Statement 5880.24 relieved defendants of their obligation to investigate some prisoners' complaints, defendants would not have complied with their duties under than Statement. Defendants had a duty under the Statement to send to the Central Office "copies of any documentation in the institution or in the possession of the inmate". At the very least, therefore, defendants had a duty to determine if the Central Office had copies of the documents Alexander furnished them.

**13.** Our dissenting colleague argues that the defendants may not be held liable because their indifference to Alexander's claims did not cause him any injury. *Infra,* part III at 1403–02.

Whether or not this is so is simply irrelevant to the disposition of this appeal. In this interlocutory appeal we review only the district court's determination that the defendants were not entitled to qualified immunity. The result turns on whether the defendants' conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Our finding that the defendants were not entitled to qualified immunity does not preclude them from raising any number of arguments at trial, including the argument that their actions did not injure Alexander. However, we have no occasion to address the injury issue at this stage in the proceedings.

responsible for keeping him in prison beyond what turned out to be his proper release date. Defendants merely implemented a decision made by the Bureau of Prisons' Central Office, which was charged by applicable regulations with the responsibility for making this decision. My colleagues reach the contrary conclusion only by hammering a square peg into a round hole.

As I see it, the Bureau of Prisons made a wholly rational decision to centralize foreign jail credit determinations; local prison officials do not have the power to reverse those decisions once made, are fully entitled to rely on them in responding to complaints by prisoners and are shielded from liability when they act in accordance with the Central Office's determinations.

By reaching the contrary conclusion, the majority severely undermines the chain of authority established by the Bureau of Prisons for handling the complex and sensitive matter of foreign jail credits. More broadly, it places a serious burden on prison officials to second-guess decisions made by their superiors, at the risk of personal liability should those decisions turn out to be wrong. While the majority opinion deals only with decisions involving foreign jail credits, it applies far more broadly to all manner of Bureau of Prisons determinations over which local prison officials have no control. After today, prison officials in this circuit will no longer feel safe in relying on Central Office determinations, but will feel compelled to revisit those decisions lest they be hit with crushing financial liability for failing to "investigate" a prisoner's claim that the Central Office was wrong.

I

The majority glosses over the point I see as pivotal in this case: that the Central Office (and only the Central Office) can determine eligibility for foreign jail credits

and award such credits. Perrill and Rivera had no authority to grant Alexander's request for time served in Germany or to second-guess the decision of officials in Washington.

The majority suggests that the Central Office does *not* have exclusive authority over claims for foreign jail credit. Maj. at 1399. This is simply not so. Under 18 U.S.C. § 3568,[1] the Attorney General and the Bureau of Prisons are responsible for computing sentences and awarding prisoners credit for jail time already served. *United States v. Clayton*, 588 F.2d 1288, 1292 (9th Cir.1979); see also *Brown v. Rison*, 895 F.2d 533, 535 (9th Cir.1990). The Bureau of Prisons has delegated the task of awarding foreign jail credits to the Central Office: "Inquiries or requests for foreign jail time credit ... must be sent to the central office Chief of Administrative Systems [Central Office] for *verification* and monitoring purposes." Bureau of Prisons Program Statement No. 5880.24, at 5c(1)(a) (emphasis added). Verification in this context can only mean one thing: The Central Office determines whether requests for foreign jail credit are justified and has the final say as to whether a particular prisoner is awarded credit. Program Statement 5880.24 is thus a delegation of authority to the Central Office on matters of foreign jail credit, and a concomitant withdrawal of such authority from local prison officials who are presented with such requests.

The record bears out this interpretation of the Program Statement. According to Edgar Haynes, Chief of Administrative Systems when Alexander filed this lawsuit, his office was responsible for "reviewing sentence computations for a *final* determination as to correctness." Declaration of Edgar Haynes, CR 1, Exhibit A, at 1 (emphasis added).[2] He further stated that the Central Office researches the requests: "Through the Bureau of Prisons' Office of

---

**1.** Section 3568 was repealed by the Sentencing Reform Act of 1984, Pub.L. No. 98–473, Title II, Chapter II, § 212(a)(2), 98 Stat. 1976, 1987. This repeal, however, does not affect this case because it only applies to offenses committed after November 1, 1987. *See* 98 Stat. 2031 (1984).

**2.** The clerk's record in this action is referred to as "CR." The clerk's record in Alexander's habeas action, CIV 86–429–TUC–RMB, District of Arizona, is referred to as "CR Habeas."

General Counsel and the Department of Justice's Office of International Affairs, Criminal Division, we request from the Department of State verification of the time credit to be applied for foreign custody." Id. See also Declaration of William Perrill, CR 23, Exhibit 1, at 1 ("I am not personally responsible for the computation of inmate sentences or the determination of any applicable jail credit thereof. Federal Bureau of Prisons' policy requires that jail credit from a foreign jail be verified and monitored by the Chief of Administrative Systems, Central Office."); Declaration of Louie Rivera, CR 23, Exhibit 2, at 1 ("Included in my duties is the responsibility for the computation of sentences and any applicable jail time credit thereof of inmates confined at FCI, Tucson. I have *no* responsibility, however, for computing *foreign* jail credit. Federal Bureau of Prisons' policy requires that this be done by our Central Office.") (emphasis in original).

Thus, the undisputed evidence shows that the Central Office makes the determinations and handles the difficult tasks involved therein: contacting other government agencies to obtain documents which are often written in foreign languages, interpreting these documents in light of their meaning in foreign legal systems and applying the relevant regulations to make a calculation.

The exclusive authority of the Central Office in the area of foreign jail credits was well-known to all of the parties. Alexander filed a Request for Administrative Remedy while he was incarcerated at FCI–Terminal Island on December 9, 1985 (before he entered defendants' charge on June 23, 1986) and received the following reply from his warden:

All documents received must be through official channels and verified as authentic prior to being accepted as official, as well as the determination must be made that all days of jail credit actually apply to the case at hand. This is done at the Central Office, BOP, after the receipt of the official documents from the State Department.

CR Habeas 19, Exhibit 2. Plaintiff has not disputed that the Bureau of Prisons delegated authority in this manner. Indeed, in his habeas petition, he acknowledged that "the matter of jail credits for foreign jails is a matter of decision with the Central Office." CR Habeas 1, at 24.

In sum, both the law and the undisputed evidence establish that the Central Office makes authoritative determinations on foreign jail credit. Prison officials such as Perrill and Rivera have no role in making the calculations or awarding the credit.

II

The majority is right that under the Bureau of Prisons Administrative Remedy Procedure, local prison officials such as defendants are responsible for investigating complaints brought in the prison system to which they are assigned. 28 CFR § 542.11(a)(3). But the defendants' duty to investigate does not mean that they must do somebody else's job or second-guess the decisions entrusted to the Central Office. Defendants fulfilled their duty to investigate Alexander's complaint by determining that the Central Office had evaluated his claim and by relying on its decision. This is so for two reasons.

A. First, in analyzing the defendants' duty to investigate in this situation, we must consider the administrative scheme set up by the Bureau of Prisons.[3] The

**3.** My colleagues marvel that neither of the parties cited *Haygood v. Younger,* 769 F.2d 1350 (9th Cir.1985) (en banc), *cert. denied sub nom Cranke v. Haygood,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986), on which the majority places great weight. The parties did not miss a great case; *Haygood* is not cited by anyone because it is not on point. In *Haygood,* the defendants were charged with making the relevant sentencing computation; the authority had not been delegated to other officials. Thus,

the prison officials could not argue that the responsibility for making the computation belonged to another office and that they had verified that this office had in fact made a determination. The prison officials did rely on an attorney general's opinion. Id at 1353. But an advisory opinion is not the same thing as a determination by the office that has binding authority on an individual matter. The prison officials in *Haygood* remained fully responsible

Bureau of Prisons has made a wholly rational decision to centralize the administration of foreign jail credit matters.[4] As the district court recognized, foreign jail credit issues are often quite complex, see RT at 21, requiring an understanding not only of our country's prison regulations, but those of numerous other nations as well. The Bureau of Prisons has made what it considers to be an efficient division of labor. Rather than requiring officials at 66 separate facilities to master the complexities involved, the Bureau has assigned the task of resolving these difficult and often sensitive issues to experts in the Central Office. Maintaining records regarding foreign jail credit at a central location facilitates monitoring and ensures correct and consistent application of the regulations.

Because the Bureau of Prisons has assigned to its Central Office the task of investigating claims for foreign jail credit, it was reasonable for Perrill and Rivera to rely on the Central Office's determination and defer to its expertise.[5] Defendants did not have the necessary knowledge and training to perform an independent investigation of Alexander's claim or to evaluate his documentation. Under the Bureau of Prisons' administrative scheme, any such investigation would have duplicated the Central Office's efforts and functions.

The majority's only remaining argument is that defendants were under a duty to determine whether the Central Office had copies of documents that Alexander claimed to possess. Maj. at 1399 and n. 12. It cites 5c(1)(a) of Program Statement No. 5880.24, which says that prison officials must send copies of a prisoner's documentation to the Central Office. The majority seems of the view that defendants should have checked to see that Alexander's Central Office file was complete because nothing in the record suggests "that the defendants had reason to believe that the Central Office had seen any of Alexander's material before coming to its conclusion." Id. at 1399.

The record does not support this argument. In his complaint, Alexander does not claim that he alerted defendants to any specific deficiencies in his Central Office file. Instead, he quotes the following from the September 12, 1986, Request for Administrative Remedy he submitted to defendant Perrill: "I am entitled to full credit against my sentence, as detailed in the papers *already submitted* to the Central Office." CR 1, at 14 (emphasis added).[6] Alexander's claim for relief thus does not rest on the majority's rationale; in fact, he asserts that he told defendants the Central Office already had his documentation.

The rest of the record similarly refutes the majority's implicit assumption that the Central Office made its July 2, 1986, determination without seeing all of Alexander's documentation. During his incarceration at Terminal Island, Alexander submitted several sets of documents to the Bureau of Prisons. See Declaration of Cleo A. Lehenbauer, Administrative Systems Manager of Federal Correctional Institution, Terminal Island, CR 31, Exhibit G; Declaration of Edgar Haynes, CR 1, Exhibit A, at 1–3. The Warden at Terminal Island stated the following in responding to Alexander's December 9, 1985, Request for Administrative Remedy:

---

for the calculation. *Haygood* may be factually similar, but legally has little to do with this case.

**4.** "[W]e must accord substantial deference to an interpretation of section 3568 by the agency charged with its administration...." *Brown,* 895 F.2d at 535; *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The majority fails to give deference to the Bureau of Prisons' policy of delegating foreign jail credit decisions to officials at the Central Office. It also fails to explain why this administrative scheme is an unreasonable interpretation of section 3568; I doubt that it could.

**5.** See *Guerra v. Sutton,* 783 F.2d 1371, 1375 (9th Cir.1986) (government officials may reasonably rely on the decisions of other officials).

**6.** Defendant Perrill, on behalf of the institution, responded to Alexander's Request on the bottom half of the form as follows:

*According to the memorandum received in our office from the Chief of Administrative Systems on July 2, 1986, you are entitled to jail credits on your three year sentence for the period from 10/09/84 to 6/23/85. Prior to that date, you were serving a local sentence and are not entitled to jail time credit on your federal sentence.*

Your request for relief is denied.
CR Habeas 23, Exhibit A.

You are correct in your statement that long before your sentencing (final determination of sentence) on October 21, 1985 that you submitted certain documentation alluding to your confinement in Germany based on an extradition warrant filed on behalf of the United States. This documentation was submitted in three increments, approximately March, July and lastly, December 1985.... Approximately mid-December 1985, the final packet of documents submitted by you were checked and presented to the Office of General Counsel and Review with a cover letter by the Office of the Chief, Administrative Systems, BOP with an estimated turnaround period of two months.

CR Habeas 19, Exhibit 2.

There is nothing in the record to suggest that Alexander claimed to have any "new" documents to present to the Central Office when he arrived at defendants' facility in Tucson on June 23. Alexander has not pointed to a single document which he had and which defendants failed to pass on to the Central Office, either before or after it made its July 2 determination. Since plaintiff bears the burden of showing that defendants violated his rights, his failure ·in this regard is fatal to his claim.[7]

B. Second, because it was not within defendants' authority to grant Alexander's claim or make a binding determination as to foreign jail credits, we are precluded from holding that defendants were under a constitutional duty to investigate his claim. A government official can be liable in a *Bivens* action only if a constitutional violation occurs within the scope of his authority. *See Otto v. Heckler,* 781 F.2d 754, 757, amended 802 F.2d 337 (9th Cir.1986). Government officials are not responsible when the actions of others cause the plaintiff's rights to be violated. *Rauschenberg v. Williamson,* 785 F.2d 985, 988 (11th Cir.1986); *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980), *cert. denied* 451 U.S. 908, 101 S.Ct. 1975, 68

L.Ed.2d 295 (1981); see *Tallman v. Reagan,* 846 F.2d 494, 495 (8th Cir.1988) (per curiam).

In *Rauschenberg,* for example, a former parolee brought a *Bivens* action against his former parole officer, alleging, *inter alia,* that the officer had improperly recommended to the parole board that he undergo psychiatric treatment. The court rejected his claim on the ground that only the parole board, not the individual parole officer, had authority to require the parolee to submit to treatment. The court concluded, "a parolee should not be entitled to damages from a parole officer for the officer's role in recommending or administering a parole condition." 785 F.2d at 988.

Here, defendants had no authority to determine whether Alexander was entitled to foreign time-served credit. His rights were violated because Central Office personnel, acting pursuant to a delegation of authority made by applicable regulations, incorrectly calculated his sentence. Since the Central Office authorized the improper confinement of Alexander, defendants cannot be held liable in a *Bivens* action. Alexander cannot obtain damages from two local prison officials for the Central Office's mistake.

### III

By short-circuiting the administrative scheme set up by the Bureau of Prisons, the majority obscures another crucial point: Even if defendants failed to fulfill their responsibilities under applicable regulations, Alexander cannot claim any injury because it made no difference in this case. Even if defendants had asked Bureau of Prisons officials to review the calculation or had inquired as to whether the Central Office file was complete, Alexander still would have been incarcerated improperly. We know this for two reasons.

First, as discussed above, the record suggests that the Central Office had all of Alexander's documents when they made

---

**7.** Also, as discussed below, even if defendants had failed to pass on some documents, Alexander cannot claim any injury. See p. 1404. Defendants' actions did not make any difference because Alexander could have appealed their determination within the Bureau of Prisons and presented any and all documents that he possessed via the administrative appeals process.

their authoritative determination. See pp. 1402–1403. Hence, any failure to verify that his file was complete simply didn't matter; the file, in fact, was complete.

Second, any failure by defendants to notify Bureau of Prisons officials that Alexander thought his sentence had been improperly calculated didn't matter; he had the right to bring the matter directly to their attention. The Bureau of Prisons administrative remedy procedure allows inmates to appeal adverse decisions by prison officials.[8] If Alexander felt that defendants had ignored his request or failed to handle it properly, his remedy was to present any and all documents in his possession to the Regional Director and, if still not satisfied, to the General Counsel.

We require prisoners to exhaust this administrative appeals process, which was designed to check the actions of local prison officials, because it will correct many of their errors. See *Chua Han Mow v. United States*, 730 F.2d 1308, 1313 (9th Cir. 1984) ("It is only when a prisoner has exhausted his administrative remedies that he becomes entitled to litigate the matter in ... court."), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985). The district court denied Alexander's first petition for habeas corpus because he had not pursued his remedies within the Bureau of Prisons. CR Habeas 17.

Alexander subsequently pursued the Bureau of Prisons appeal procedure without success,[9] renewed his petition for a writ of habeas corpus, and succeeded in getting the writ. In Alexander's case, the Regional Director and General Counsel failed to correct the Central Office's mistake. The district court finally calculated his sentence properly. We are faced with the fact that the Central Office, and then the Regional Director and Office of the General Counsel, simply got it wrong, even with all the information in hand. The internal review process, unfortunately, is not foolproof.

This is regrettable. But the fact is, Alexander was improperly incarcerated because a number of Bureau of Prisons officials made bad calls in resolving a complex matter. Defendants actions were not the source of the error, and their failure to ask anyone else to look into the situation or to pass on documents did not make any difference; the Bureau of Prisons officials who had the power to correct the error did not do so, even when they were notified of Alexander's claim and had the complete file to review. Alexander thus cannot claim any injury from defendants' actions, and they cannot be held liable for damages in a *Bivens* actions.

IV

The majority's conclusion that defendants are not entitled to summary judgment on the issue of qualified immunity will have repercussions far beyond this case. By finding that prison officials are not entitled to qualified immunity when they show that they followed all applicable regulations and that other officials were responsible for the calculation, the majority undermines the Bureau of Prisons' administrative scheme for making foreign jail credit determinations. The scheme provides for Central Office handling of the substantive determinations. Yet the ma-

8. 28 CFR § 542.15 outlines the appeal procedure:

If an inmate is not satisfied with the Warden's response, that response may be appealed on the appropriate form to the Regional Director within twenty (20) calendar days of the date of the Warden's response. If the inmate is not satisfied with the Regional Director's response, that response may be appealed on the appropriate form to the General Counsel within thirty (30) calendar days from the date of the Regional Director's response. Where a valid reason for delay is stated by an inmate these time limits may be extended. Appeal to the Office of General Counsel is the final administrative appeal in the Bureau of Prisons.

9. Alexander submitted proof to the district court that he had filed the necessary appeals with the Bureau of Prisons and had been denied at each stage. On September 12, 1986, he filed a Request for an Administrative Remedy that was denied by Perrill on September 16. CR Habeas 23, Exhibit A. On September 17, 1986, he submitted a Regional Administrative Remedy Appeal, which was denied by the Regional Director on September 29. Id, Exhibit B. On October 4, 1986, Alexander filed his final Bureau of Prisons appeal with the General Counsel. CR Habeas 24, Attachment. This appeal was denied on November 7, 1986. Id.

jority implies that it is not enough for prison officials to fulfill their duty under Bureau of Prisons regulations and forward information to the Central Office, leaving the calculations to the Central Office. It is not clear to me what prison officials are now supposed to do when prisoners are dissatisfied with Central Office determinations. It will certainly not be clear to prison officials, who will probably try to second-guess Central Office determinations in order to protect themselves from crushing financial liability. So much for the Bureau of Prisons' sensible decision to centralize the handling of foreign jail credit matters.

More broadly, the majority's analysis extends to all manner of Bureau of Prisons determinations over which local wardens and other officials have no control. The majority's failure to respect Bureau of Prisons regulations allocating responsibility for foreign jail-time credit determinations renders the rest of the administrative scheme vulnerable. Whenever a prisoner claims that Central Office officials were wrong about something, local prison officials will revisit those decisions in order to avoid personal liability, despite the fact that they are ill-equipped to do so. The majority essentially inverts the Bureau of Prisons chain of command, requiring local officials to check and second-guess the decisions of their superiors—decisions which they do not have the expertise to evaluate or the authority to reverse. This places a serious burden on local prison officials and throws a monkey wrench into an administrative scheme designed to bring expertise to bear in the most efficient way possible.

### Conclusion

I sympathize with the majority's frustration with the prison bureaucracy and certainly regret that Alexander was the victim of a bureaucratic mistake that cost him nine months of freedom. But it wasn't the defendants' mistake. The only mistake in this case was made by Central Office employees; if they violated a clearly established right, Alexander might have a *Bivens* claim against *them*.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth

The majority stretches the term "investigate" beyond all recognition by using it to support a *Bivens* claim against *defendants* for Alexander's improper incarceration. The duty to investigate is simply part of the Bureau of Prisons' internal procedure for handling complaints. A *Bivens* remedy based on the duty to investigate, as construed by the majority, makes local prison officials personally liable for the full range of constitutional violations that may occur in the prison system, whether or not they have any responsibility for or ability to prevent those errors. The Bureau of Prisons surely never meant for local officials to bear this burden of liability by requiring them to operate a grievance procedure.

In attempting to do justice to Alexander, we must not do an injustice to Rivera and Perrill. By ignoring the record and the distribution of responsibility in the prison system, the majority holds two local officials liable for harm they did not cause and which they were helpless to prevent.