Cornelius **ALSTON**, et al., Plaintiffs,

v.

Thomas **READ**; Nettie Simmons; et al., Defendants.

Civ. No. 07–00266 SPK–LEK.

United States District Court, D. Hawai'i.

Jan. 14, 2010.

Jack F. Schweigert, Rory S. Toomey, Honolulu, HI, for Plaintiffs.

John F. Molay, Office of the Attorney General, for Defendants.

Colin A. Yost, Cruise & Yost, Daniel M. Gluck, American Civil Liberties Union Hawaii, Honolulu, HI, for ACLU.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

SAMUEL P. KING, Senior District Judge.

### INTRODUCTION

Plaintiff Cornelius Alston (a.k.a. Neil Hallman) is a former Hawaii state prisoner. He was supposed to have been released from prison on August 4, 2007, after having served a 10–year sentence for a 1997 drug-related conviction, as well as several other years before that for a previous robbery conviction. For reasons that are the subject of this lawsuit—and for which there might ultimately be a reasonable explanation or defense—Alston was not released until December 27, 2007. (In June 2007, the State Department of Public Safety changed his release date from August 2007 to November 2011, but released him after he obtained an Amended Judgment on December 27, 2007.) As it turns out, Alston was in prison about 145 days more than what his sentencing judge had intended. This is a 42 U.S.C. § 1983 civil rights lawsuit brought by Alston and other allegedly similarly-situated Plaintiffs primarily seeking damages for "over detention."

Defendants Thomas Read and Nettie Simmons are the State DPS employees responsible for changing or re-calculating Alston's release date from 2007 to 2011. They have moved for summary judgment seeking dismissal as to claims by Alston.[1] The motion was argued in September 2009. After argument, the Court issued inclinations and requested additional briefing. The parties, including *amicus curiae* the American Civil Liberties Union of Hawaii Foundation ("ACLU"), then submitted supplemental briefing and evidence in September and October of 2009. The Court has now reviewed the evidence submitted and carefully considered all written and oral argument. For reasons set forth, the motion is GRANTED as to Counts Five and Six (the claims for violation of the Hawaii State Constitution and for negligence) but the motion is otherwise DENIED.

---

1. The Second Amended Complaint names ten other Plaintiffs besides Alston. It also alleges that there is a class of similarly-situated persons, although none of the class issues such as certification have yet been addressed. Each Plaintiff, even if they were "over detained," might have different factual circumstances as to important issues such as the language of the judgment of conviction or type of prior convictions or sentences involved. This motion addresses only Alston's factual circumstances. Many of the key legal issues, however, would be common as to each Plaintiff and the rulings here would likely apply in different degrees to the others. This motion serves as a type of "test case." Any issues regarding the propriety of potential class certification are well beyond the scope of this motion.

## SUMMARY

• Count Five of the operative complaint (entitled "State Constitutional Violations") fails to state a claim. Even assuming Alston's State Constitutional rights were violated, such a violation is not cognizable under the federal civil rights law, 42 U.S.C. § 1983. *See, e.g., Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 371 (9th Cir.1998). And Hawaii's appellate courts have apparently not recognized such a claim under state law. *See, e.g., Mow by Mow v. Cheeseborough,* 696 F.Supp. 1360, 1365 (D.Haw.1988). Count Five is dismissed. *See, e.g., Galario v. Adewundmi,* Civ. No. 07–00159 DAE–KSC, 2009 WL 1227874, at *11 (D. Haw. filed May 1, 2009) (granting summary judgment against a plaintiff because such a cause of action has not been recognized).

• Count Six for negligence also fails to state a claim. The claim asserts that a 2004 Settlement Agreement from *Tapaoan v. Cayetano,* Civ. No. 01–00815DAE–LEK, created a duty to implement procedural safeguards that would assure proper and timely release of prisoners. It alleges that Defendants in their official capacities breached this duty through their negligence. Section 1983 does not generally provide a remedy for negligence. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 328–29, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). And, in any event as a matter of state law, a contractual duty cannot form the basis of a common-law negligence claim. *See, e.g., Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 971 P.2d 707, 708 (1999). The Eleventh Amendment also bars the negligence claim for damages. *See, e.g., Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

• Federal rights are otherwise implicated. The Court rejects Defendants' argument that, because only an interpretation of a state statute is involved, there are only state rights at issue. Rather, potential deprivation of a "paradigmatic liberty interest"—freedom from incarceration—is evident for purposes of a Section 1983 analysis. *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (1992). There are genuine issues of material fact as to (1) whether Defendants violated Alston's due process rights under the Fourteenth Amendment to the U.S. Constitution, and (2) whether Defendants were "deliberately indifferent" to Alston's rights under the Eighth Amendment to the U.S. Constitution. *See, e.g., McNeil v. Dir., Patuxent Inst.,* 407 U.S. 245, 246, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (holding that continued detention after a state loses power to hold a prisoner because a sentence expires violates rights under the Fourteenth Amendment); *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir. 1985) ("Detention beyond the termination of a sentence could constitute cruel and unusual punishment if it is the result of 'deliberate indifference' to the prisoner's liberty interest[.]") (citation omitted); *Alexander v. Perrill,* 916 F.2d 1392, 1398 (9th Cir.1990) ("prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so" when reasonably presented with such evidence).

• Qualified immunity for Defendants is inappropriate at this stage of the proceedings. Disputed questions of material "historical fact" prevent the granting of qualified immunity now. Disputes of material historical facts are for a jury even though the Court would decide as an issue of law the ultimate question of objective reasonableness in a qualified immunity inquiry—whether, even if constitutional rights were violated, Defendants Read or Simmons nevertheless could have believed that their conduct was lawful. *See, e.g., Torres v. City of Los Angeles,* 548 F.3d 1197, 1210–11 (9th Cir.2008). The primary qualified immunity inquiry would be whether it

would have been clear to a reasonable prison official with Defendants' duties that their conduct "was unlawful *in the situation [they] confronted.*" *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasis added). It remains unclear what "the situation they confronted" was when Defendants failed to investigate whether their change in Alston's release date from 2007 to 2011 was contrary to the language of Alston's November 20, 1997 judgment. The Court cannot decide the "objective reasonableness" of Defendants' actions on the current disputed factual record, and so Defendants are not entitled to qualified immunity from suit. (One or both Defendants might, however, ultimately be entitled to a *defense* of qualified immunity at trial. *See, e.g., Torres,* 548 F.3d at 1211 n. 9 (noting that "when a case proceeds to trial 'qualified immunity can no longer rightly be called an 'immunity from suit' (since the suit has already proceeded to its conclusion); rather, it is now effectively a defense.'") (quoting *Sloman v. Tadlock,* 21 F.3d 1462, 1468 n. 6 (9th Cir.1994)).

## BACKGROUND

### A. Hawaii Law Regarding Multiple Sentences of Imprisonment.

Hawaii Revised Statutes § 706–668.5 establishes a base line for determining a term of imprisonment where a State of Hawaii convict has multiple sentences. This action centers around applications or interpretations of the older (pre–2008) version of Section 706–668.5, which read in pertinent part as follows:

> (1) If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively. *Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.* (Emphasis added.)

As emphasized, different sentences for multiple terms of imprisonment imposed at different times were supposed to run consecutively, unless a State court had ordered otherwise. Such different sentences would be added together, back-to-back. The "default" was consecutive.

However, despite the statutory language, the evidentiary record indicates that the prior (pre–2005) accepted "practice" was generally to treat such sentences to run *concurrently.*[2] Thus, during the

---

**2.** For example, Defendant Simmons testified in her deposition as follows:

> Q. [Plaintiffs' counsel] ... was there a time that the Department of Public Safety just took the position ... that if it didn't say, you're to treat it as concurrent and only make it consecutive if the order specifically said that?
> A. [Simmons] Yes.
> Q. When did that policy change?
> A. I don't believe there was a policy ... I believe there was a practice.
> ....
> Q. [After 2004 was] when you started to treat it as if it doesn't say concurrent, you'll treat it as consecutive?
> A. Yes. I believe that was January 1st, 2005 when the new policy went into effect.
> Q. And before that January, 2005 policy went into effect ... the practice was to treat it as concurrent unless it didn't say?
> A. Yes.

[Plaintiff's Exh. 22, Simmons depo. of Aug. 1, 2008, at 41–43]. Similarly, the following exchange occurred at Defendant Read's deposition:

> Q. [Plaintiffs' counsel]: [Simmons is] saying it was the [pre-January 2005] practice to, if the judge didn't say, to treat it as concurrent.
> A. [Read] For aspects of concurrent/consecutive—
> Q. That's what I'm focusing on.

period at issue with Alston in 1997, the "practice" was generally for multiple sentences from different convictions to run *at the same time* absent some other indication. Even if there might be some dispute of fact in this regard, the Court assumes for purposes of this summary judgment motion that, before 2005, it was understood with the State courts, with attorneys practicing in those courts, and with the Department of Public Safety that the "default" was for multiple sentences imposed at different times to run concurrently. At minimum, the record indicates that the practice in 1997 was, at least sometimes, contrary to a strict application of the language of Section 706–668.5.

### B. Defendants Implement a Change in Sentencing Practice.

Thomas Read is the Offender Management Administrator with the State of Ha-

A. As long as we clarify it's on that ... It is absolutely true.

. . . .

Q. That practice was, as far as this calculation of whether it's a concurrent sentence or consecutive sentence for picking a guy's maximum term release date, prior to [January 2005], the practice was to treat it as concurrent if the judge didn't say otherwise?

A. That was the general way that it was done.

[Plaintiff's Exh. 21, Read depo. of June 25, 2009, at 21–23].

The record also indicates that the State *courts* in 1997 had a similar understanding of the practice to treat multiple sentences imposed at different times to run concurrently as a default. *See, e.g.,* Plaintiffs' Exh. 5 (Dec. 19, 2007 Motion to Correct Judgment), at ¶ 6 (stating: "At the time of [Alston's] sentence in the instant case on November 20, 1997, this Court and the Department of Public Safety treated multiple sentences of imprisonment as concurrent, unless stated otherwise. Even if the court minutes stated that the sentences were to run concurrently, the judgment often did not include ... those words.").

waii Department of Public Safety. [Read depo. at 4]. He has a law degree and has extensive prior experience with the Federal Bureau of Prisons and the U.S. Department of Justice. [*Id.* at 6]. He is the State official ultimately responsible for determining release dates of State prisoners (or at least the official responsible for interpreting court orders or judgments that imposed terms of imprisonment). [*Id.* at 7]. Read was hired in late–2004, at least in part specifically to "develop a policy and procedure to fix" problems with computations of multiple sentences. [*Id.* at 4, 26–27, 58] [*See also* Simmons depo. at 43 ("Tom Read implemented the new policy") ]. The problems apparently included (1) the prior pre–2005 "practice" just described that was inconsistent with a strict interpretation of the then-statutory language of Section 706–668.5, and (2) legal issues raised in *Tapoaon, et al. v. Cayetano et al.,* Civ. No. 01–00815DAE–LEK (D.Haw.).[3] [Read depo. at 26–27, 58].

**3.** *Tapaoan* was a related, though substantively different, 2001 federal class action against the State and State officials alleging constitutional violations primarily for illegal searches and seizures resulting from not immediately releasing prisoners after a court-ordered release (*e.g.,* acquittal or dismissal), but instead returning them to custody (and routinely strip-searching them as they re-entered a prison facility) pending "out processing" and obtaining of documentation. [*See, e.g.,* Defendants' Exh. A to Aug. 31, 2009 Response to Brief of Amicus Curiae].

*Tapaoan* ultimately settled in 2004, with the State entering into a Class Action Settlement Agreement. [*Id.*]. That Agreement, among many other things, obligated the State Department of Public Safety to "keep[ ] statistical records and conduct[ ] yearly PSD audits or reviews of release practices and polices ... to ensure that inmates are being released in a timely manner." [*Id.* at 12]. Plaintiffs rely on this Settlement Agreement as establishing relevant duties here both for purposes of an alleged negligence claim, as well as relating to the alleged Constitutional violations. The Court's view, however, is that Tapaoan is at most a collateral background case. The primary situation with Alston and other similarly-situated persons here is different—this ac-

There is some indication that the State had previously released some prisoners early, i.e., prisoners with actual consecutive sentences who were being released based upon a belief that the multiple sentences were concurrent. [Simmons depo. at 43–44].

Read developed and implemented a formal written policy to, *inter alia,* treat multiple sentences imposed at different times as running *consecutively,* unless ordered otherwise (consistent with the then-current language of the statute). This formal policy is, or was, written as Department of Public Safety Policy No. COR.05.05, and became effective January 1, 2005. [Plaintiffs' Exh. 6]. In particular, Section IV(2) of COR.05.05 provided that "Multiple terms of confinement imposed at different times will run consecutively unless specifically ordered otherwise by the court." [*Id.* at p. 3]. The practice or policy understandably was written to become consistent with a strict reading of the statutory language.[4] In short, the "practice" changed.

Nettie Simmons is a staff person under Read's authority in the Department of Public Safety. She is the State official who reviewed information and performed relevant computations of Alston's sentence and release dates in 2007. [Simmons depo. at 4, 6–11]. She also responded to or wrote responses to various letters writ-

ten by Alston in 2007. [*E.g.,* Plaintiffs' Exh. 14].

Both Read and Simmons have been sued in their individual and official capacities. [Second Amended Complaint of Aug. 14, 2009, at ¶¶ 10–11]. It is well-settled that the State itself cannot be sued for damages under Section 1983. *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Further, Section 1983 claims for damages against persons in their official State capacities are equivalent to claims against the State itself and are therefore also barred. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, the Court's analysis here is confined to claims against Defendants in their individual or personal capacities.

## C. The Effect on Plaintiff Cornelius Alston's Release from Prison.

Plaintiff Cornelius Alston has had multiple State convictions (i.e., different unrelated convictions involving multiple counts), with different terms of imprisonment having been imposed at different times. He was convicted in 1988 for robbery (Crim. No. 87–0457). [Defendants' Exh. C (Apr. 30, 2009), at 4; Exh. E, at 2; Exh. H, at 3]. After serving some time in prison and being paroled [Exh. E, at 2],

tion concerns whether computations or recomputations of release dates themselves led to violations of fundamental rights.

**4.** In 2008, the Hawaii Legislature changed Haw.Rev.Stat. § 706–668.5 to make the "default" more consistent: concurrent sentences whether or not imposed at the same time or different times. The current version (effective to all terms of imprisonment imposed on or after June 18, 2008, i.e., not retroactively) provides in pertinent part as follows:

§ 706–668.5. Multiple sentence of imprisonment

(1) If multiple terms of imprisonment are imposed on a defendant, whether at the same time or at different times, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. Multiple terms of imprisonment run *concurrently* unless the court orders or the statute mandates that the terms run consecutively. (Emphasis added.)

Effectively, the Legislature changed the statutory language so as to be consistent with past (pre–2005) practice (but inconsistent with the 2005 policy implemented by Read and the DPS). Again, the current case involves the prior version of the statute.

and apparently with an intervening probation violation in 1990 [Exh. C, at 4], his probation was revoked in 1991. [Exh. C, at 8]. He received a 10–year sentence, with credit for time served, on May 3, 1991. [*Id.*].

In 1997, apparently while again released on probation, Alston received a second major conviction (Crim. No. 97–0506). He was convicted of two counts of promoting a dangerous drug. [Defendant's Exh. D, at 1]. Count I was Promoting a Dangerous Drug in the Second Degree, and Count II was Promoting a Dangerous Drug in the Third Degree. [*Id.*]. The November 20, 1997 Judgment of Conviction, signed by since-retired State Circuit Judge Herbert Shimabukuro, listed the word "Incarceration" followed by a box in which was printed under the term "YEARS": "I—TEN (10)\* II—FIVE (5)\* ", referring to ten years for Count I and five years for Count II. The Judgment then contained the following key language:

> *Sentences are to run concurrently.* \*Mandatory minimum sentence as to Count I is Three (3) Years and Four Months. Mandatory minimum sentence as to Count II is One (1) year, and Eight (8) Months. Defendant is given credit for time served. (Emphasis added.)

[*Id.*]. This is the Judgment that was later relied upon by Defendants in 2007.

However, the corresponding written order from that November 20, 1997 hearing was not filed until December 10, 1997 (about 20 days *after* the Judgment was filed). [Defendants' Exh. H, Order attached to Simmons depo.]. The four-page "Findings of Fact, Conclusions of Law, and Order Imposing Mandatory Minimum Term of Imprisonment for Repeat Offender Sentencing" described Alston's relevant prior conviction [*id.,* at 3], and sentenced him to mandatory minimum terms. [*Id.* at 4]. The written order for a mandatory minimum sentence was probably made

pursuant to Haw.Rev.Stat. § 706–606.5 regarding sentencing of repeat offenders. It requires a written opinion if the sentencing court imposes "a lesser mandatory minimum period of imprisonment ... than that mandated by [the] section." Haw.Rev. Stat. § 706–606.5(5). The December 10, 1997 Order of Judge Shimabukuro ended with the following paragraph:

> .... Defendant is sentenced to mandatory minimum term of three (3) years and four (4) months in Count I, Promoting a Dangerous Drug in the Second Degree and one (1) year and eight (8) months in Count II, Promoting a Dangerous Drug in the Third Degree, to run *concurrent* with each other *and any other sentence Defendant is serving.* (Emphasis added.)

[Exh. H, Order at 4]. Defendants apparently did not have a copy of this written Order in June 2007.

Given the November 20, 1997 Judgment of 10–years in prison, and with pre-sentence credit of 105 days, Alston's release date from custody was August 4, 2007. [Simmons depo. at 30; Defendants' Exh. E, at 6 (calculating 10 years from 11/20/97 minus 105 days time served); Plaintiffs' Exh. 25 (attached to Plaintiffs' Sept. 30, 2009 Response to Court's Amended Inclination)]. The August 2007 release (or "max out") date was apparently understood from 1997 until June 2007 to be Alston's operative release date. Alston was in State custody from 1997 to 2007, most recently in a correctional facility located in Mississippi. [Plaintiffs' Exh. 14].

In mid–2007, as Alston's release date approached, Defendants re-examined Alston's situation. They did so pursuant to the January 2005 policy that Read wrote and implemented set forth in Department of Public Safety Policy No. COR.05.05, as described earlier. They have been performing such re-examinations as inmates

are scheduled for release. [Simmons depo. at 21–23; Read depo. at 37]. Defendants re-examined the language of Alston's November 20, 1997 Judgment and interpreted the term "sentences are to run concurrently" to refer to the two separate counts of promoting a dangerous drug in Crim. No. 97–0506. This ten-year sentence, so they then determined, was then to run *consecutive* to the remaining part of the sentence for the prior 1988 robbery conviction in Crim. No. 87–0457. They changed his release date.

Accordingly, with no prior notice to Alston, Defendants wrote a letter dated June 14, 2007 to Alston at his place of incarceration in Mississippi. In the letter, Defendants changed Alston's release date from August 4, 2007 to November 17, 2011. [Defendants' Exh. F]. The letter signed by Simmons and Read stated:

> During . . . review it was discovered that there were errors in your computation resulting in the wrong maximum release date. Cr. No. 97–0506 sentenced on November 20, 1997 shall run *consecutive* to Cr. No. 87–0457 sentenced on May 3, 1991 pursuant to HRS § 706–668.5.
>
> . . .
>
> We have updated our database and will notify the Hawaii Paroling Authority (HPA) and the Mainland Branch of this discovery. Based on our computation, your maximum term release date is now November 17, 2011.

[*Id.* (emphasis in original)].

After receiving the June 14, 2007 letter, Alston was understandably upset. He wrote a series of letters or notes to the DPS and Simmons complaining about the change and various other matters (including collateral complaints about (1) using his wrong name—Hallman rather than Alston; (2) parole revocation hearings in 1994; and (3) issues with a 1997 surgery in the Halawa Correctional Facility medical unit). [*See* Alston Decl. of Sept. 28, 2009,

and letters attached thereto (attached to Plaintiffs' Sept. 30, 2009 Response to Court's Amended Inclination)]. It is unclear whether all of these letters are in the record or even still exist. However, Alston's primary concern was certainly with the re-calculated release date. For example, in a typed letter written to Simmons and Read dated July 5, 2007, he wrote:

> Your updated information is based on a factual error. Please review case number Cr. # 97–0506, the courts (sic) Judgment and Guilty Conviction and Sentence entry. . . . *THIS IS NOT A CONSECUTIVE SENTENCE* . . . . this matter does merit expeditious attention and correction of your records. (Emphasis in original.)

[Exh. 25C, letter attached to Alston Decl. of Sept. 28, 2009]. Similarly, he hand wrote a letter (with an obscured date) "to whom it may concern" at the DPS stating

> Judge Herbert K. Shimabukuro: on 11–20–97, sentenced me to 10 years in prison on . . . # 97–0506 to run 'concurrently' mandatory minimum . . . The mistake is that Mr. (sic) Nettie Simmons of D.P.S. applied the Hrs (sic)706–668.5 consecutive sentence statute to my case. I was not given any consecutive term from my 87 charge to my 97 charges. I need my attorney name who handle my 97 case. Also court room transcripts from the 87 case, case # 87–0457. And transcripts from 97 case # 97–0506. also if you have Cr. no. 87–0457 sentenced on May 3, 1991 Please your attention in this matter is much appreciated.

[Exh. 28F, letter attached to Alston Decl. of Sept. 28, 2009].

After receiving Alston's complaint letters, Simmons and Read re-checked their calculation. Simmons "took a second look at those [same] documents" and concluded that Alston was wrong and that the change to 2011 was correct. [*E.g.,* Simmons depo. at 59; Read depo. at 43 ("We just checked

to make sure that there was nothing else")]. Simmons and Read responded to Alston's correspondence by a letter dated August 3, 2007 stating that

> [y]ou are correct in that your sentence for Cr. No. 97–0506 does state 'sentences are to run concurrently' which refers to the two counts in that criminal case alone, and both are running concurrently. However, pursuant to HRS § 706–668.5, the sentence term in Cr. No. 97–0506 imposed on November 20, 1997 shall run consecutive to Cr. No. 87–0457, which was imposed at a different time.

[Plaintiffs' Exh. 14(A)]. Similarly, in a letter of October 5, 2007, Simmons and Read wrote Alston that

> ... an audit was conducted back in June 2007 to ensure the accuracy of your sentence computation. During our review, it was determined that your sentence computation was computed in error which resulted in a wrong maximum release date.
>
> At this time, no adjustments to your maximum release date will be done. In addition, an amended judgment for Cr. No. 97–0506 is needed from the courts stating our time to 'run concurrent with any time currently serving' in order for PSD to update our records.

[Plaintiff's Exh. 28H; Plaintiff's Exh. 14(B)]

Again, it is evident that, in June 2007 when they changed Alston's release date from 2007 to 2011, Simmons and Read did not have a copy of the December 10, 1997 written Order from Judge Shimabukuro (the Order that read "... to run concurrent with each other and any other sentence Defendant is serving"). [E.g., Simmons depo. at 35, 53, 59; Read depo. at 29, 33, 34].

Further, it appears to be undisputed that neither Simmons nor Read (1) made any effort (either initially, or in response to Alston's correspondence) to look for any underlying written court order regarding Alston's mandatory minimum sentence; (2) did not review the court docket sheet; and (3) otherwise did not "think to go look to see what the order might be[.]" [E.g., Simmons depo., at 13, 15, 33, 37, 59],[5] or felt they had no duty to look for any other information besides the Judgment that they had. [E.g., Read depo. at 32, 33, 35–37, 43].[6]

---

**5.** For example, Simmons testified at deposition as follows:

> Q. Did you go to the courthouse at all?
> A. No.
> ....
> Q. Did you even think of looking to go to the courthouse to check anything out on what should be [Alston's] sentence for purposes of recalculating?
> A. No.

[Simmons depo. at 13].

> Q. It would be important to you to know what [Alston's] mandatory minimum sentence is when you're setting a release date?
> A. Yes.
> Q .... there would be an order dealing with a mandatory minimum, right?
> A. Yes.
> Q. In fact, there has to be under law, findings of fact, conclusions of law and all that, dealing with the prosecutor's motion for setting of a mandatory minimum that a judge approves?
> A. Yes.
> Q. Did you think to look at that order setting the mandatory minimum?
> A. It's stated in the judgment. That's the only thing I reviewed.
> ....
> Q .... did you think to look for any orders dealing with this issue before determining that recalculation was warranted?
> A. No.

[Id., at 34–35, 37].

**6.** For example, Read testified in part as follows:

> Q .... you were aware of the practice that was in place in 1997[?]
> ....
> A. I am aware of exactly what we've stated before, what the practice was in terms of

Read contends it is generally the State Judiciary's job to provide DPS with relevant documents. [Read depo. at 39, 40]. His position is that DPS must rely on the Judgment, and it is not the DPS's job to look for underlying or supporting orders such as the December 10, 1997 Order regarding Alston's mandatory minimum sentence. [*E.g., id.* at 36, 39, 40].[7] Defendants essentially argue that their duty was to apply the language of Section 706–668.5 and that they were simply following state law. [*E.g., id.* at 63, 86 ("We just try to follow what the law says"); Defendants' Memorandum in Support of Motion, at 5; Defendants' Aug. 31, 2009 Response to Brief of Amicus Curiae, at 9].

Plaintiffs respond by looking to the "unless the court *orders*" language of Section 706–668.5. They point out that the statute does not refer to a sentencing *judgment,* and argue that the language requires the DPS to look to what the court actually *ordered* (including, for example, required written orders on mandatory minimum sentences) especially before *changing* an inmate's release date.

There is some indication that, if Defendants had actually looked at the December 10, 1997 written order (again, with the key language "... to run concurrent with each other *and any other sentence Defendant is serving*"), they might not have changed Alston's release date and he would have been released on August 4, 2007. [*See* Read depo. at 36 (answering as follows: "... clearly the language on this finding of fact is different from the [judgment].... If the Department of Public Safety had been given or sent by the court or defense counsel this, we would have computed it differently. But we were not.")]. Defendants, however, also maintain that they could not have released Alston on August

running everything concurrent unless it's specifically stated consecutive.
Q ... did you not see a need to go any further?
A. No, I saw no need whatsoever.
....
Q .... you're aware ... that with a mandatory minimum sentence set, that there would also be findings of fact, conclusions of law and an order?
A. yes, sir.
Q. In fact, it would have to be, by statute?
A. For the mandatory minimum, that's correct.
....
Q. Did you look for that order setting a mandatory minimum?
A. No, sir.
[Read depo., at 32–33].

7. Read testified in part as follows:
Q. You're aware that the statute that you're talking about, 706–668.5 ... deals with orders? It doesn't mention the word "judgment."
A. Yeah. But the court has to give us the order before we can do anything with it.
....
Q. There's a duty put on the Department of Public Safety to make sure they're able to give this guy an accurate maximum term release date, right? You're aware of that?
A. Our determination is simply that we can only deal with what orders there are. But the judgment that the Department of Public Safety gets is this [referring to document]....
...
And there's no duty for us to go down for every case in the entire state of Hawaii and search through the clerk's files for court documents that the court doesn't send us.
.... the Department of Public Safety can only deal with the records and the judgments that are sent by the court. It's not incumbent upon the Department of Public Safety to go get things in the court.
....
Q .... my earlier question was, wouldn't you agree a mistake was made here with Mr. Alston?
A. No. You said, is there a mistake made on behalf of the Department of Public Safety? I disagree with that.
Q. You're saying it's the court's responsibility?
A. I do.
[Read depo. at 34, 36–37, 40].

4, 2007 without an amended judgment. [*Id.* at 45, 46, 49].

On December 19, 2007, a State deputy public defender filed a Motion to Correct Judgment on behalf of Alston.[8] The motion explained the prior circumstances and asked the State court to "correct" the Judgment in Cr. No. 97–0506 to include a sentence reading "The sentence shall run concurrently to any other sentences currently serving[.]" [Plaintiffs' Exh. 5, at 3]. Accordingly, on December 27, 2007, the State court issued an Amended Judgment in Cr. No. 97–0508 stating "Sentences to run concurrently with each other and to also run concurrent with any other sentence being served." [Defendants' Exh. G]. The Amended Judgment included the language "nunc pro tunc from November 20, 1997." [*Id.*].[9] Alston was released the same day. But in the meantime he had been imprisoned about 145 days past August 4, 2007.

The record indicates that Alston's situation was not the first, and apparently not the only time, such an "over detention" has been made. In particular, there is specific evidence (although the precise circumstances are not in the record) indicating that similar "over detentions" have occurred with Plaintiffs Auld [Plaintiffs' Exh. 7], Brooks [Exh. 9], Liulama [Exh. 11], and Miller [Exh. 13]. All of these situations, however, appear to have occurred *after* 2007 when Alston's circumstances arose. Plaintiffs allege there are hundreds of past or current prisoners in similar circumstances. [Second Amended Complaint, at 5]. Simmons estimated she had done about a hundred recalculations just in 2007 alone [Simmons depo. at 31]. Although the record is unclear whether Alston's "recalculation" was one of the early re-calculations done in accordance with the new 2005 policy, all indications are that Alston's was certainly not the *first* occurrence of an "over detention" (i.e., a similar situation where DPS would not release a prisoner until a judgment had been amended to include language stating that sentences were intended to run concurrently with any other sentence being served). *See Temblor v. Lopez*, Civ. No. 07–00429DAE–BMK, 2008 WL 234375 (D.Haw. Jan. 28, 2008) (describing similar circumstances of a Hawaii prisoner being "over detained" improperly in 2006, a year before Alston's situation arose). Indeed, the current action was filed in early–2007, which was *before* Alston was released from prison, based upon similar allegations with other named Plaintiffs. Alston was only added as a Plaintiff in 2009. (These facts might be important in assessing whether Defen-

---

**8.** The deputy public defender, Karen Nakasone, had been representing Alston at a December 3, 2007 parole proceeding, when she discovered that DPS had changed his release date in June 2007 from 2007 to 2011 contrary to the language of the December 10, 1997 Order. [Plaintiffs' Exh. 5, at 2].

**9.** Regarding the meaning of "nunc pro tunc," the Ninth Circuit recently explained:

"*Nunc pro tunc* signifies now for then, or in other words, a thing is done now, which shall have [the] same legal force and effect as if done at [the] time when it ought to have been done." *United States v. Allen*, 153 F.3d 1037, 1044 (9th Cir.1998). This "inherent power of the court to make its records speak the truth," *id.*, "is a limited one, and may be used only where necessary to correct a clear mistake and prevent injustice." *United States v. Sumner*, 226 F.3d 1005, 1009–10 (9th Cir.2000). The power does not, however, allow the court "to alter the substance of that which actually transpired or to backdate events to serve some other purpose. Rather, its use is limited to making the record reflect what the ... court actually intended to do at an earlier date, but which it did not sufficiently express or did not accomplish due to some error or inadvertence." *Id.* at 1010 (citations omitted).

*In re Warren*, 568 F.3d 1113, 1116 n. 1 (9th Cir.2009).

dants might have had some notice or reason to think that Alston's re-calculated release date in particular was contrary to the intent of his sentencing judge.)

### D. Procedural History.

This action was filed on May 18, 2007 (again, prior to Alston's recalculation), and was originally captioned as *Bajo & Tafoya v. Lingle*. Subsequently, the complaint was amended pursuant to stipulation on March 24, 2009 to add several more Plaintiffs including Alston. A Second Amended Complaint was filed on August 14, 2009, alleging on behalf of eleven named Plaintiffs the following six causes of action: (1) "Unreasonable Search and Seizure Under Fourth & Fourteenth Amendments;" (2) "8th Amendment (Cruel & Unusual Punishment);" (3) "14th Amendment (Due Process);" (4) "Violation of Ex Post Factor [sic] Law;" (5) "State Constitutional Violations;" and (6) "Negligence."

Defendants' Motion for Partial Summary Judgment was heard on September 11, 2009. The Court also received helpful briefing from *amicus curiae* ACLU of Hawaii Foundation as to certain of the legal issues. After the hearing, the Court issued inclinations and asked for supplemental submissions to address more specific questions. Accordingly, the parties and *amicus* then submitted supplemental briefing in September and October of 2009.

Reviewing the summary judgment record (and construing disputes in the evidence in the light most favorable to Alston as is required when considering a summary judgment motion), the Court focused its inquiry on several factual and legal questions. What specific information did Defendants have when they recalculated Alston's release date from 2007 to 2011? What duty did they have to investigate at that time and after Alston's complaints about the change? What rights could have been implicated? Did Alston have a due process right to deprivation of liberty? Were Defendants "deliberately indifferent" to federal rights when they failed to check court records for an order that contained information about Alston's sentences, rather than relying only on the November 20, 1997 Judgment? And even if there are questions of fact as to such issues, do Defendants have qualified immunity (as a matter of law) from suit, either because their duty to investigate was not clearly established or because they acted reasonably, but mistakenly?

The Court has given particular thought to the qualified immunity question. Defendants were, after all, apparently just trying to "follow the law" in applying the language of Section 706–668.5. Ultimately, however, the Court finds it inappropriate to grant qualified immunity from suit at this stage. There are important and material questions of historical fact in dispute.

## DISCUSSION

### A. Count Five—Hawaii State Constitution.

Count Five invokes Article I, Section 5 (due process), Section 6 (privacy), Section 7 (searches, seizures), and Section 13 (excessive punishment) of the Hawaii State Constitution. These essentially are the State Constitution's parallel provisions to the Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution. Plaintiffs allege that these provisions of the State Constitution were violated based upon the factual allegations of the operative complaint. In substance, if the federal provisions were violated, similar State provisions were violated.

But, even assuming the State Constitution was violated, the question here is whether there is a remedy in federal court for such violations. This lawsuit is in federal court based upon a federal question—

alleged violations of 42 U.S.C. § 1983. That section provides, in pertinent part, that any "person" who, "under color of law," deprives another of "any rights, privileges, or immunities secured by the [United States] Constitution and laws," "shall be liable to the party injured[.]" *E.g., Will*, 491 U.S. at 60 n. 1, 109 S.Ct. 2304; *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) ("The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' ").

■ Section 1983 is a remedy for violations of certain federal rights. Violations of state law (including a state constitution), however, are not cognizable under Section 1983. *See, e.g., Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir.1998) ("state law violations do not, on their own, give rise to liability under § 1983[.]") (citation omitted).

Moreover, there apparently is no State statutory or case-law equivalent to 42 U.S.C. § 1983. *See, e.g., Mow by Mow v. Cheeseborough*, 696 F.Supp. 1360, 1365 (D.Haw.1988) (dismissing similar claim, reasoning that "Hawaii state appellate courts have yet to enunciate whether the State recognizes a cause of action for damages arising from a deprivation of rights under the Hawaii Constitution as against individuals").[10] The Court thus will not allow Count Five to remain, even as a State-law claim pendent or supplemental to a federal claim under Section 1983. Count Five is dismissed. *See, e.g., Galario v. Adewundmi*, Civ. No. 07–00159 DAE–KSC, 2009 WL 1227874, at *11 (D. Haw. filed May 1, 2009) (granting summary

judgment against a plaintiff because such a cause of action has not been recognized).

### B. Count Six—Negligence.

Count Six for negligence also fails to state a claim. The claim alleges as follows:

58. Pursuant to the agreement approved in *Tapaoan v. Cayetano*, Civil No. 01–00815DAE/LEK, Defendant State [sic?—the State is not a Defendant here] had a duty to implement procedural safeguards that would assure the timely release of prisoners submitted into Defendant State's care, custody & control so as to be sure that the Plaintiffs and member of the Class were released from jail in accordance with the sentencing court's mandate.

Notwithstanding, Defendants through their own negligent acts and omissions breached this duty of care which caused Plaintiffs to suffer injury from over-detention and strip searches for which Defendants Read and Simmons in their official capacity are liable.

[Second Amended Complaint, at 14].

■ By its terms, Count Six asserts that the 2004 Settlement Agreement from *Tapaoan* created a duty to implement procedural safeguards that would assure proper and timely release of prisoners. It alleges that Defendants breached this duty through their negligence. No other duty is alleged.

■ There is no federal claim in Count Six. Section 1983 does not generally provide a remedy for negligence. *See, e.g., Daniels v. Williams*, 474 U.S. 327, 328–29, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Al-

---

**10.** By case law, the U.S. Supreme Court has recognized a non-statutory federal remedy, similar to a remedy under Section 1983, to enforce violations of federal law by federal (not state) officials. *See Bivens v. Six Unknown Named Agents of Federal Bureau of* *Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The parties have not cited, and the Court is unaware of, any opinion from a Hawaii appellate court recognizing a similar State-law remedy for a State Constitutional violation.

though it was apparently pled as a pendent or supplemental state law claim, it also fails on that ground. As a matter of state law, a contractual duty cannot form the basis of a common-law negligence claim. *See, e.g., Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 971 P.2d 707, 708 (1999) ("Hawai'i law will not allow tort recovery in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends [a] breach of the contract."). And even if a negligence claim could be pled based upon some other independent state duty, Count Six by its terms is an "official capacity" claim based upon actions of Read and Simmons. [SAC at ¶ 59 ("... Defendants through their own negligent acts and omissions breached this duty of care which caused Plaintiffs to suffer injury ... for which Defendants Read and Simmons in their official capacity are liable.") ]. Such a claim against the State is barred by the Eleventh Amendment. *See, e.g., Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."). The Court also doubts that there is any clear and convincing evidence of "malice" necessary to overcome a state-law privilege shielding public officials from liability for state torts. *See Towse v. State,* 64 Haw. 624, 647 P.2d 696, 702 (1982).

## C. Federal Claims

■ At this summary judgment stage, a viable 42 U.S.C. § 1983 claim requires some evidence of two essential elements: (1) the Defendants acted "under color of [state] law," and (2) their conduct deprived Plaintiff of protected federal constitutional or statutory rights. *See, e.g., Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir.

1985); *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002).

Here, there is no dispute regarding the first element. It cannot be disputed that Read and Simmons, in their individual capacities, were acting "under color of state law." Defendants, however, argue that the second element is lacking. They contend that only state rights are at issue because the rights stem from an interpretation of a State statute, Haw.Rev.Stat. § 706–668.5. They also argue that because no court had actually ruled that they erroneously interpreted the statute as applied in Alston's situation, no federal rights are at issue. The Court disagrees.

It might be true that Section 706–668.5 by itself creates no Constitutionally-protected rights (such as a property or liberty interest). *Compare, e.g., Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). However, that is not Plaintiffs' claim. Plaintiffs are not contending that Section 706–668.5 was applied wrongly and thereby deprived them of a right, for example, to have the statute interpreted correctly. The statute did not create the rights at issue. The issue is not that a Constitutional "deprivation" occurred specifically by changing Alston's release date in June 2007; rather, no deprivation could have occurred until after August 4, 2007 (when, we now know, Alston should have been released). Plaintiffs' claim is primarily that they were wrongfully deprived of fundamental Constitutional rights by Defendants' actions that were done pursuant to State law. Alston argues that Defendants did not reasonably inquire as to whether they had the necessary facts to apply the statute correctly, and that this failure led to Constitutional violations (i.e., a deprivation of liberty, imposition of cruel and unusual punishment, and unnecessary searches and seizures). Merely because an interpretation of state law is involved, does not

make the alleged deprivations of only state rights. *See, e.g., Temblor v. Lopez,* No. 07–00429DAE–BMK, 2008 WL 3827368, at *4–6 (D.Haw. Aug. 14, 2008) (Order rejecting a similar argument by Defendants under similar facts).

■ There are obvious federal rights at issue. Alston and other Plaintiffs are alleging a potential deprivation of a "paradigmatic liberty interest"—freedom from incarceration. *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (1992). There is ample evidence of such a deprivation of liberty for purposes of a Section 1983 analysis. The evidence indicates Alston served about 145 days longer—i.e., was deprived of liberty—than what his sentencing judge had intended. And, as analyzed to follow, the Eighth amendment is also implicated.

*C.1. Due Process under the Fourteenth Amendment.*

Given a protected liberty interest, the next question in a deprivation-of-due-process analysis is determining what process is due. *See, e.g., Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). *Zinermon* explained that identifying deprivation of an appropriate right is not enough:

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Id.* at 126, 110 S.Ct. 975.

■ Alston has met his burden to demonstrate a triable issue as to a deprivation of due process of law. *See, e.g., McNeil v. Dir., Patuxent Inst.,* 407 U.S. 245, 246, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (holding that continued detention after a state loses power to hold a prisoner because a sentence expires violates rights under the Fourteenth Amendment); *Haygood,* 769 F.2d at 1354 ("Liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.").

■ In *Haygood,* the Ninth Circuit, sitting en banc, essentially rejected the arguments made by Defendants here. It reasoned that "the Fourteenth Amendment does not guarantee state prisoners a particular method of calculating prison sentences. But when the state itself creates a statutory right to release from prison, the state also creates a liberty interest and must follow minimum due process appropriate to the circumstances to ensure that liberty is not arbitrarily abrogated." *Haygood,* 769 F.2d at 1355 (citations omitted).

Here, Defendants forthrightly testified that they changed Alston's release date without any type of hearing, and would have considered any type of hearing to have been an administrative burden. [*E.g.,* Read depo. at 54–55, 63].[11] Only if they

11. For example, Read testified:

Q. Did you consider giving him a hearing on that issue?
A. What would the hearing be ... ?
Q. The hearing would be to prove that it's concurrent. He's maintaining he's concurrent. You're saying he's consecutive.

A. If he had any documentation other than what was in his file, he could have provided it and we would have had no need to have a hearing.
. . . .
What would the purpose of the hearing be? It would be a wasted—we'd hold it and say, "Here's what we've got. Have you got any-

consider a judgment to be ambiguous will they inquire further. [*E.g., id.*, at 50]. They did not consider Alston's November 20, 1997 Judgment to be ambiguous. But even if they did not hold a hearing, there is a question whether existing procedures provided possible relief before a deprivation of liberty actually occurred after August 4, 2007. That is, it is unclear whether there was any meaningful "process" available between June 14, 2007 (approximately when Alston was notified of the change) and August 4, 2007 (after which he would have been deprived of liberty).

For example, it is unclear whether a Hawaii inmate prison grievance system could have provided a timely remedy, should Alston have sought one. *Cf.* Halawa Correctional Facility Policy No. 2.12.03 (covering "Inmate Grievance and Appeals Process" and effective Aug. 15, 1990), at p. 7, section 4.3.d.11(c) (appearing to allow grievances for "sentence computation"), and p. 12, section 4.7a.1) (allowing grievances for "the interpretation and application of departmental and institutional policies, procedures and practices"). It is also unclear whether state remedies, such as the amended-judgment procedure ultimately used here by Alston's public defender in December 2007, provided necessary process. Perhaps he could have sought to amend his judgment earlier, in the weeks after June 14, 2007, but before August 4, 2007.

It does appear clear, however, that an exception for "random and unauthorized"

acts, and for which concomitant post-deprivation remedies might be available, is inapplicable here. *See, e.g., Zinermon,* 494 U.S. at 129–130, 110 S.Ct. 975 (discussing the "*Parratt* [*v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ] doctrine" whereby an adequate state post-deprivation remedy will satisfy procedural due process where a constitutional deprivation results from "random and unauthorized" action). The Ninth Circuit addressed and rejected this issue in *Haygood,* holding that a deprivation of liberty against a prisoner based upon an error in the method used to compute a release date cannot be "random and unauthorized." *Haygood,* 769 F.2d at 1357. It reasoned:

> where the injury is the product of the operation of state law, regulation, or institutionalized practice, it is neither random nor unauthorized, but wholly predictable, authorized, and within the power of the state to control. In such cases, the state may not take away the protected interest without a hearing in advance of the injury.

*Id.* (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)).

These aspects of a due process claim were not raised or briefed. (And these types of questions, at minimum, would prevent the Court from now entering judgment *sua sponte* in favor of Alston, as *amicus* suggests.) The Court need not

thing?" He's got nothing. I mean, there would be no purpose to a hearing.

. . . .

There's no requirement for due process anywhere in … the majority of case law that I'm aware of … if an error is made during the incarceration, it can be corrected. And it's not a due-process-type hearing.

Now, we will always listen. . . . If they provide documents, we will definitely consider

them. We verify their authenticity. But the number of inmates we've got and the very limited staff we've got, we cannot chase every case.

We've got guys that write eight, ten times, and we check, and the only documents they've got are this. The hearing would be pretty much a wasted process. And the fact that they're persistent does not mean that they've got a valid cause.

[Read depo. at 54–55].

resolve these questions here. Alston, however, has certainly met his burden to oppose Defendants' motion in this regard to demonstrate a viable due process claim. *See Haygood,* 769 F.2d at 1358. Defendants have failed to meet their burden to demonstrate that they are entitled, either factually or legally, to summary judgment as a matter of law on the merits of a due process claim.

### C.2. Eighth Amendment Violations and "Deliberate Indifference."

*Haygood* did much more than discuss the contours of a due process claim. As quoted earlier, *Haygood* established that "over detention" of a prisoner by mistakes in computing sentencing release date also implicates the Eighth Amendment's right to be free of cruel and unusual punishment. The Ninth Circuit held that "[d]etention beyond the termination of a sentence could constitute cruel and unusual punishment if it is the result of 'deliberate indifference' to the prisoner's liberty interest[.]" *Haygood,* 769 F.2d at 1354 (citation omitted). The Ninth Circuit repeated this standard in *Alexander v. Perrill,* 916 F.2d 1392 (9th Cir.1990). *Alexander* established a "duty to investigate" in certain factual situations. Its essential holding is that "prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so" when reasonably presented with such evidence. *Id.* at 1398.

 Applying *Haygood,* there are genuine issues of material fact. There is evidence, construed in the light most favorable to Alston, that Defendants were "deliberately indifferent." In particular, in making this determination a trier-of-fact could look to what Simmons and Read knew when they wrote their letters to Alston (e.g., the August 3, 2007, and October 5, 2007 letters). A trier-of-fact would examine what they knew when they

did not look for an underlying order. What information did they have indicating that the underlying December 10, 1997 was inconsistent with the November 20, 1997 judgment? Does the evidence reflect undisputably that Defendants had no reason to believe they were wrong as to Alston's "max-out" date?

Defendants have argued that there was no "mistake," given the information they had before them when they changed Alston's "max-out" date. They argue they had no reason to know that the November 20, 1997 Judgment was inconsistent with other court orders. The answer, however, centers around what duty if any Defendants had to investigate. It depends on what they knew and when they knew it. It might reasonably be believed *generally,* as Defendant Read stated during his deposition, that "there's no duty for us to go down [to the state court] *for every case in the entire state of Hawaii* and search through the clerk's files for court documents that the court doesn't send us[.]" [Read depo. at 36 (emphasis added) ]. But such a belief might not be reasonable where, among other things:

(1) The November 20, 1997 Judgment being relied upon was written under a different regime (i.e., when the DPS had a known "practice" of treating sentences imposed at different times to be concurrent unless specifically stated otherwise—albeit in apparent contradiction to the then-current language of Haw.Rev.Stat. § 706–668.5). Defendants knew the prior practice differed. They changed it. They could have inferred that prior judgments would reflect that prior practice and could be worded incompletely;

(2) The Judgment might have been ambiguous when it stated "sentences to run concurrently" (e.g., *which* sentences ran concurrently?); and

(3) The same situation might have been occurring frequently after the DPS implemented its new January 2005 policy. Again, Alston's situation was not the first situation where the DPS made a "mistake" (i.e., changed a previously-calculated sentence "max-out" date based upon a judgment which did not specifically say *all* sentences ran concurrently, only to have that judgment amended *nunc pro tunc* to reflect a contrary intent). Had it become obvious that Alston's change in release date could be contrary to a sentencing judge's intentions? Approximately how many times might it have occurred previous to Alston?

It might be understandable (and thus not constitute "deliberate indifference") to strictly apply DPS's new post–2005 policy to a few cases. And there is a large administrative burden with some six-thousand prisoners, many of whom likely have multiple sentences, and only limited DPS staff. However, at some point it might become obvious that an inmate is likely being held too long, especially if—time after time—the re-calculated release date is found to be contrary to the intent of the sentencing judge. At some point, "deliberate indifference" can arise.

A trier-of-fact could also consider whether a reasonable prison official should have inquired or investigated further, especially (1) where Section 706–668.5 does not restrict the sentencing determination to a "judgment" but refers to whether the court "ordered" sentences to be concurrent or consecutive; and (2) where it was known that a State statute (Haw.Rev.Stat. § 706–606.5(5)) required a written order regarding mandatory minimum sentences.

*See, e.g., Alexander,* 916 F.2d at 1398–99 (discussing situations where duty to investigate might arise); *Temblor v. Lopez,* Civ. No. 07–00429DAE–BMK, 2008 WL 234375, at *6 (D. Haw. Jan. 28, 2008) (same).

The reasoning in *Alexander* was that "[the Ninth Circuit] will not . . . embrace a rule which would allow prison officials to stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim." 916 F.2d at 1398. Although there is no evidence that Alston provided Simmons or Read with a copy of the actual December 10, 1997 Order (i.e., "documentary evidence in support of his claim"), a trier-of-fact could find that these circumstances provided equivalent reason to trigger a duty for Defendants not "to stand by idly." *Id.*

In short, Defendants have not demonstrated an absence of a genuine issue of material fact, or that they are entitled to judgment as a matter of law, on the merits of an Eighth Amendment claim.

### C.3. Qualified Immunity.

There are genuine issues of material fact as to (1) whether Defendants violated Alston's due process rights under the Fourteenth Amendment to the U.S. Constitution, and (2) whether Defendants were "deliberately indifferent" to Alston's rights under the Eighth Amendment to the U.S. Constitution.[12] The Court next addresses whether Defendants are nevertheless entitled to qualified immunity. That is, even if Defendants violated Alston's constitutional rights or if there are such questions of

---

**12.** There is little mention of Count One, the alleged violations of the Fourth Amendment (illegal searches and seizures), in the briefing. Rather, the parties have focused on the circumstances leading to the alleged due process and Eighth Amendment violations and rights as discussed in cases such as *Haygood* and

*Alexander.* The Court, however, does not consider the search and seizure claims to have been abandoned. Rather, any potential recovery for such Fourth Amendment violations would necessarily require a prerequisite finding that Alston's prolonged custody was improper in the first place.

fact, does qualified immunity shield them from suit under Section 1983? *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[13]

■■■■ "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson*, 129 S.Ct. at 815 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular [government] conduct." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151. The doctrine acknowledges that it is often difficult for a government official to determine how a particular legal doctrine will apply to a particular (and perhaps novel) factual situation. This is why "all but the plainly incompetent or those who knowingly violate the law" have immunity from suit; officials can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Id.* at 202, 121 S.Ct. 2151.

■■■■ Here, the Court must assess whether, even if constitutional rights were violated, Defendants Read or Simmons nevertheless could have believed that their conduct in changing Alston's release date without further investigation was lawful. Viewed objectively, would it have been clear to a reasonable prison official with Defendants' duties that their conduct "was unlawful in the situation [they] confronted"? *Id.* Qualified immunity is a question of law for the Court, although certain threshold questions of disputed material "historical fact" could be factual issues for a jury. *See, e.g., Torres v. City of Los Angeles*, 548 F.3d 1197, 1210–11 (9th Cir. 2008) (reasoning that the ultimate question of objective reasonableness is for the court but disputes of "material historical facts" are for a jury).[14]

Because there are disputes of fact as to "deliberate indifference," it might seem like it would necessarily be inappropriate to grant qualified immunity. One might assume that an official who was *"deliberately* indifferent" could never have believed their conduct was lawful. Indeed, the Ninth Circuit had held that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity." *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992), *overruled as stated in Es-*

---

**13.** *Saucier* required, as a threshold inquiry, a decision on whether a defendant's conduct violated a constitutional right, construing the evidence or allegations in the light most favorable to the party asserting the injury. 533 U.S. at 201, 121 S.Ct. 2151. If there was no violation, the inquiry stopped. If there were questions of fact, then a court was next to decide whether, objectively, a violation was of a "clearly established" right. The inquiry asks whether a reasonable defendant nevertheless could have understood that their conduct was unlawful in the situation they confronted. *Id.* at 202, 121 S.Ct. 2151. If not, then a defendant had immunity. In *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009), the Supreme Court gave courts some flexibility in the qualified immunity analysis, giving courts the discre-

tion to address either prong first. However, it is appropriate here to follow *Saucier* and address whether a constitutional violation could have occurred before addressing whether applicable rights were "clearly established."

**14.** A jury would not actually decide whether conduct was objectively reasonable. It would only decide disputed threshold issues of material historical fact. *Torres*, 548 F.3d at 1210–11; *see also Keylon v. City of Albuquerque*, 535 F.3d 1210, 1218–19 (10th Cir.2008). Although this procedure could lead to "serious logistical difficulties" at a trial, it is sometimes necessary if there are truly material disputes of threshold "historical fact." *Torres*, 548 F.3d at 1211.

tate of *Ford v. Ramirez–Palmer,* 301 F.3d 1043, 1048–49 (9th Cir.2002).

In *Estate of Ford,* however, the Ninth Circuit interpreted *Saucier* and recognized that "[c]ourts may not simply stop with a determination that a triable issue of fact exists as to whether prison officials [acted unconstitutionally]." 301 F.3d at 1053. Even if there is a question of fact for a jury as to whether there was deliberate indifference or a deprivation of due process, it does not necessarily mean Defendants cannot have qualified immunity. "*Saucier's* key point is that the qualified immunity inquiry is separate from the constitutional inquiry." *Id.* at 1049. Because there are subjective and objective prongs, *Estate of Ford* rejected the argument that "a reasonable officer could not possibly think it reasonable, i.e., lawful, to be deliberately indifferent [and thus have qualified immunity.]" *Id.; see also Marquez v. Gutierrez,* 322 F.3d 689, 693 (9th Cir.2003) ("[a] claim of qualified immunity is not defeated simply because a triable issue of fact exists as to whether [defendant's] decision to shoot [plaintiff] was malicious"). It is possible for officials to be deliberately indifferent, but yet think they were acting lawfully. And so, the Court must proceed to view the alleged conduct objectively and make a finding as to the objective reasonableness of Defendants' conduct.[15]

■ Here, the Court finds at minimum that there are disputes of "material historical fact." *Saucier* requires a court to address whether a reasonable prison official with Defendants' duties could have believed that their conduct "was unlawful *in*

the situation [they] confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. There are factual disputes about, among other questions, whether Read or Simmons had a duty to inquire further before changing Alston's release date and whether they acted with actual "deliberate indifference." Thus, it is unclear what "the situation they confronted" was when they failed to investigate whether their change in Alston's release date from 2007 to 2011 was contrary to the language of Alston's November 20, 1997 judgment. The Court cannot at this stage grant Defendants immunity from suit.

If it is found as a matter of fact that either Simmons or Read (or both) were "deliberately indifferent," it is not likely the Court would then hold (e.g., by granting a directed verdict or judgment as a matter of law) that they could have reasonably believed their conduct was lawful in the situation they confronted. Compare, for example, the ruling by the Honorable David A. Ezra in *Temblor. See Temblor v. Lopez,* Civ. No. 07–00429DAE–BMK, Order Granting Defendants' Motion for Summary Judgment, 2008 WL 3827368 (D.Haw. Aug. 14, 2008). In that order, Judge Ezra granted qualified immunity to Simmons and Read when facing a similar situation of a 27–day "over detention" in 2006. *Id.* at *7. *Temblor* differs significantly because there a DPS official actually investigated. Indeed, it was the DPS official's action that led to the release. *See id.* ("when Defendants became aware of Plaintiff's possible over-detention, they un-

---

**15.** Even if *Estate of Ford* and *Saucier/Pearson* require a court to *address* the objective reasonableness of a defendant's behavior (i.e., not *automatically* deny qualified immunity if there is a question of fact as to a constitutional violation), it certainly does not mean a court must *grant* qualified immunity. Although a finding of deliberate indifference does not automatically lead to a denial of

qualified immunity, in many situations it will. A court, however, is required under *Estate of Ford* to address qualified immunity as a matter of law (i.e., proceed to the next *Saucier/Pearson* step) and, as exemplified here, address one way or the other whether a reasonable officer could reasonably have believed the actions were lawful.

dertook an immediate, thorough, and eventually fruitful investigation of Plaintiff's complaints, leading to Plaintiff's release only 27 days after his initially scheduled release date."). No such investigation occurred here with Alston. Indeed, Temblor's situation in 2006 might have provided some notice to Defendants that their reexamination with Alston in 2007 might have been contrary to the sentencing judge's intent under the prior (pre–2005) practice.

Nevertheless, there is enough uncertainty in the record so that one or both Defendants (the inquiry or expectations might well be different as between Read and Simmons) might ultimately be entitled to a *defense* of qualified immunity at trial. *See, e.g., Torres,* 548 F.3d at 1211 n. 9 (noting that "when a case proceeds to trial 'qualified immunity can no longer rightly be called an 'immunity from suit' (since the suit has already proceeded to its conclusion); rather, it is now effectively a defense.' ") (quoting *Sloman v. Tadlock,* 21 F.3d 1462, 1468 n. 6 (9th Cir.1994)). In essence, however, the Court's ruling here is a denial of qualified immunity because the Court is allowing the suit to proceed. In that sense, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Pearson,* 129 S.Ct. at 815.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment [37] is GRANTED in part and DENIED in part.

The Motion is GRANTED as to Counts Five and Six, but is otherwise DENIED. There are genuine issues of material fact as to the deprivation of federal rights. Defendants are not entitled to qualified immunity from suit at this stage of the proceedings.

IT IS SO ORDERED.